**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| PACIFIC CAPITAL BANK, N.A.<br><br>*Plaintiff*,<br><br>v.<br><br>THE STATE OF CONNECTICUT,<br><br>RICHARD BLUMENTHAL in his official capacity as Attorney General of the State of Connecticut, and<br><br>JOHN P. BURKE in his official capacity as Banking Commissioner of the State of Connecticut,<br><br>*Defendants*. | Civil No. 3:06-CV-28 (PCD) |

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Pacific National Bank, N.A. brought this suit and requested that a declaratory judgment be issued [Doc. No. 1] in order to prevent the State of Connecticut, the Connecticut Attorney General Richard Blumenthal, and the Connecticut Banking Commissioner John Burke from enforcing Conn. Gen. Stat. § 42-480 (2006) against it. Plaintiff also filed a Motion for Summary Judgment against Defendants Blumenthal and Burke [Doc. No. 25]. All three Defendants joined a Motion for Summary Judgment against Plaintiff [Doc. No. 32]. For the reasons stated herein, Defendants' Motion [Doc. No. 32] is **granted** as to the State of Connecticut only. Defendants' Motion [Doc. No. 32] is **denied** as to the other two Defendants. Plaintiff's Motion [Doc. No. 25] against these two Defendants is **granted**. The Court will also

1

issue a Declaratory Judgment as requested by Plaintiff's Complaint [Doc. No. 1].

## I.  BACKGROUND[1]

In 1864, Congress passed the National Bank Act ("NBA"), 12 U.S.C. § 21, *et seq*.  The NBA in 12 U.S.C. § 85 permits national banks to charge the interest rates allowed in their home states even when the loan would be usurious if made in another state.  See Marquette Nat'l Bank of Minneapolis v. First Omaha Service Corp., 439 U.S. 299, 313, 99 S. Ct. 540, 58 L. Ed. 2d 534 (1978).  Plaintiff is a national bank which is headquartered in California, a state with no limit on interest rates.  Defendants accept that a Connecticut law which purported to regulate the interest rates Plaintiff could charge would be preempted by the NBA.[2]

## A.  REFUND ANTICIPATION LOANS

A Refund Anticipation Loan ("RAL") is a loan made against a customer's tax return. Generally, the customer agrees to turn over his or her tax refund to the lender once it is received in exchange for a check or cash in the amount of the refund minus loan fees.  Because the amount of the loan is tied to the amount of a customer's tax refund, these loans are often offered in conjunction with tax return services.  Plaintiff offers the majority of its RALs through Jackson Hewitt, a tax preparation service in Connecticut.  Once Jackson Hewitt completes a customer's tax return, it informs the customer about Plaintiff's RAL service and provides forms so that the customer can apply for the loan.  The loans are then made entirely by Plaintiff.  In return for its

---

[1]The parties agree that there are no issues of material fact in dispute.  Unless otherwise noted, all specific facts are drawn from Plaintiff's Rule 56(a)(1) statement and are admitted by Defendants or are drawn from Defendant's Rule 56(a)(1) statement and are admitted by Plaintiff.

[2]See Op. Conn. Att'y Gen. No. 05-029 (Oct. 24, 2005) ("There is little question that preemption of state authority under the National Bank Act encompasses the regulation of interest rates charged by national banks.").

assistance, Jackson Hewitt can charge a "document processing fee" of up to $40.

Both sides discuss the benefits and detriments of RALs. Plaintiff argue that RALs provide quick cash to those who need it, and that RALs entice low-income consumers to use professional tax preparers who are more likely to request available deductions. Defendants, on the other hand, argue that RALs are a trap for the unwary. Because tax refunds are often returned in a short amount of time, banks charge high interest rates in order to profit from the loans. Plaintiff states that its average fee on an RAL is 3.3% over an 11-day period, but this becomes 115% when calculated annually. Defendants argue that high interest rates for these laws can be a serious burden for those customers who do not receive the tax return they expected.

## B.  CONNECTICUT GENERAL STATUTE § 42-480

The Connecticut legislature passed a law regulating RALs in 2004. See 2004 Conn. Pub. Acts 04-170 § 1. This law was amended one year later.[3] See 2005 Conn. Pub. Acts 05-74 § 6. Defendants submitted testimony that was given in front of the Committee on Banking when the amendment was being considered. Defendants argue that the text of the statute can be better understood by considering the problems that the legislature was attempting to remedy.

Diana Leyden, Director of the University of Connecticut School of Law Tax Clinic, testified to the Connecticut legislature and stated that many RAL facilitators are inexperienced workers, who disappear after April 15 and leave citizens with no remedy if a mistake is made. (Testimony of Diana Leyden, Esq., to the Committee on Banking in Support of Raised Bill No. 6830, March 8, 2005 [Doc. No. 33-2].) She also testified that many customers do not understand that the RAL is actually a *loan*, and not simply a faster tax return in exchange for a fee. Id.

---

[3]The amended language is the language actually at issue in this suit.

Finally, she argued that the high interest rates accompanying RALs, which were often a surprise to the customers, were a significant burden on the poor.  Defendants pointed out that RALs - and the tax returns that accompany them - were sometimes being prepared by people poorly situated to correctly complete tax returns, such as car dealers and furniture salesmen.  (Def's Rule 56(a)(1) [Doc. No. 34] ¶ 6.)  Similar arguments were put forward in the Connecticut Senate.  Senator Bill Finch stated that the bill was designed to prevent "furniture companies and car dealers" from performing tax preparation in order to sell their products.  48 S. Proc., Pt. 4, 2005 Sess., p. 002618 (remarks of Sen. Finch).

The relevant language of Conn. Gen. Stat. § 42-480 (2006), as amended in 2005 after this testimony was given, states that:

(a) As used in this section:

(1) "Borrower" means a person who receives the proceeds of a refund anticipation loan;

(2) "Facilitator" means a person who, individually, or in conjunction or cooperation with another person, makes a refund anticipation loan, processes, receives or accepts for delivery an application for a refund anticipation loan, issues a check in payment of refund anticipation loan proceeds, or in any other manner acts to allow the making of a refund anticipation loan. The term does not include a bank, savings and loan association, credit union or person issued a license under the provisions of sections 36a-555 to 36a-573, inclusive, operating under the laws of the United States or this state, or any person who acts solely as an intermediary and does not deal with the public in the making of a refund anticipation loan;

(3) "Refund anticipation loan" means a loan arranged to be paid directly from the proceeds of a borrower's income tax refund . . . .

(b) At the time a borrower applies for a refund anticipation loan, a facilitator shall disclose to such borrower on a document that is separate from the loan application [various information designed to educate the borrower about the cost and nature of the

4

loan.]

(c) No refund anticipation loan shall be made at any location other than a location in which the principal business is tax preparation.

(d) The interest rate for a refund anticipation loan shall not exceed (1) sixty per cent per annum for the initial twenty-one days of such loan, and (2) twenty per cent per annum for the period commencing on the twenty-second day of such loan and ending on the date of payment.

(e) Any facilitator who violates any provision of this section shall be [subject to a fine or lawsuit.]

The term "facilitator" specifically excludes national banks and is used to limit the application of

subsections (b) and (e), but *not* subsections (c) and (d).

Plaintiff claims that § 42-480 has unlawfully affected its business by requiring that

unprofitably low interest rates be charged for RALs.  Plaintiff brought this lawsuit requesting a

declaration that § 42-480 is unconstitutional because it is preempted by the NBA.  Both sides

have filed motions for summary judgment.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue of material fact as a matter of law."  Fed. R. Civ. P. 56(c).  No genuine issue of

material fact exists and summary judgment is therefore appropriate when "the record taken as a

whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986).

A fact is material if it "might affect the outcome of the suit under governing law" and an

issue is disputed or "genuine" when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.

Ct. 2505, 91 L. Ed. 2d 202 (1986).  However, "[c]onclusory allegations will not suffice to create

a genuine issue."  Delaware & H.R. Co. v. Conrail, 902 F.2d 174, 178 (2d. Cir. 1990).

The moving party bears the burden of establishing that summary judgment is appropriate.

See Anderson, 477 U.S. at 249.  Federal preemption of state law presents a question of law for

the court to decide and is therefore appropriate for resolution on a motion for summary judgment.

See, e.g., Bank of Am. v. City and County of San Fransisco, 309 F.3d 551, 557 (9th Cir. 2002).

Since this case presents only a question of statutory legality, it is especially conducive to

disposition by summary judgment.  See Connecticut ex rel. Blumenthal v. Crotty, 346 F.3d 84,

93 (2d. Cir. 2003).

### III.  DISCUSSION

Defendants argue that Plaintiff lacks standing to bring this suit and that the State of

Connecticut is immune from suit under the doctrine of sovereign immunity.  These two

arguments will be addressed before reaching Plaintiff's main arguments, namely, that Conn. Gen.

Stat. § 42-480 is unconstitutional because (1) it directly purports to regulate national banks in

violation of federal law, and (2) it has the effect of regulating national banks in violation of

federal law *even if the scope of the law is limited only to "facilitators."*

### A.  SUBJECT-MATTER JURISDICTION AND SOVEREIGN IMMUNITY

Defendants argue that this Court lacks subject-matter jurisdiction over Plaintiff's claims

against the State of Connecticut because the State is immune from suit.  The State argues that it

is immune from suit under the doctrine of sovereign immunity as espoused in the Eleventh

Amendment.  Plaintiff did not move for summary judgment against the State of Connecticut, nor

did Plaintiff respond to this argument in its Opposition to Defendants' Motion.  No citizen may

sue a State unless sovereign immunity has been waived.  See Edelman v. Jordan, 415 U.S. 651,

662-63, 94 S.Ct. 1347, 1355, 39 L. Ed. 2d 662 (1994).  The State of Connecticut's assertion of

immunity appears correct and is uncontested by Plaintiff; therefore, the State of Connecticut is

dismissed from this suit.  Defendants Blumenthal and Burke remain parties.

The remaining two Defendants argue that Plaintiff lacks standing to bring this suit

because § 42-480 has not yet been enforced against it.  In order for Plaintiff to have standing, it

"must show (1) that it has suffered an 'injury in fact' that is (a) concrete and particularized and

(b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the

challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the

injury will be redressed by a favorable decision."  Friends of the Earth, Inc. v. Laidlaw Envtl.

Servs., 528 U.S. 167, 180-81, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000).  Standing is a necessary

and useful tool to be used by courts in ferreting out those cases which ask the courts to render

advisory opinions or decide an artificial or academic controversy without there being a palpable

injury to be remedied.  Washakie County Sch. Dist. No. One v. Herschler, 606 P.2d 310 (Wyo.

1980).

Plaintiff argues that it will in fact be injured by § 42-480 because it impermissibly

regulates national banks and, by its exact wording, § 42-480 appears to do so.[4]  Federal law

---

[4]Conn. Gen. Stat. § 42-480(d) says simply, "The interest rate for a refund anticipation
loan shall not exceed (1) sixty per cent per annum for the initial twenty-one days of such loan,
and (2) twenty per cent per annum for the period commencing on the twenty-second day of such
loan and ending on the date of payment," with no apparent exception for national banks.
Defendants argue that this statute does not apply to Plaintiff, but this limitation is in no way
apparent from the text of the statute.

provides penalties of up to $1 million per day for national banks that violate the law.  See 12

U.S.C. § 1818(i) (2006); see also First Union Nat. Bank v. Burke, 48 F. Supp. 2d 132, 144, 147

(D. Conn. 1999) (commenting that 12 U.S.C. § 1818 includes violations of state law).  Given this

fact, Defendants' assertion that Plaintiff can "violate any provision of the statute, including the

interest rate provision, with impunity," seems unrealistic.  (Defs.' Mem. 15 [Doc. No. 33-1].)

Plaintiff currently offers RALs at little to no profit in Connecticut to comply with § 42-480, and

contends that it may be forced to discontinue offering RALs in Connecticut entirely.  (Turner

Aff. ¶¶ 4-5, Mar. 30, 2006, Ex. A to Pl.'s Rule 56(a)(2) [Doc. No. 37].)  Under this theory, § 42-

480 is actually causing Plaintiff injury, and a favorable decision would allay Plaintiff's concerns.

Defendants rely on Goleta National Bank v. O'Donnell, 239 F. Supp. 2d 745 (S.D. Ohio

2002) to show that Plaintiff lacks standing.  In Goleta, the State of Ohio brought a regulatory

action against an Ohio corporation for charging usurious loans.  Goleta, a national bank, sued to

prevent the action, claiming that the Ohio corporation made the loans as an agent of Goleta, and

that the action therefore violated the NBA.  Goleta's suit was dismissed for lack of standing

because it was noted that the Ohio corporation actually bore 90% of the loan risk.  Id., at 748.

This meant that the Ohio corporation was not acting as Goleta's agent, and Goleta had no

standing because it could show no injury to itself.  Id., at 753-74   Goleta's argument that it

would be harmed illogically presumed that Goleta would be considered the actual lender.  Id.

Defendants argue that since § 42-480 does not regulate national banks, the holding in

Goleta applies to this case; accordingly, Plaintiff is not actually being injured by § 42-480 and

has no standing in this case.  However, Defendants' reliance on Goleta in this case is misplaced.

Plaintiff claims that § 42-480 *does* regulate national banks, which contradicts Defendants'

argument that § 42-480 does no such thing.  The plain text of the statute appears to support

Plaintiff, and further inquiry is needed to decide this issue.

The Court concludes that Plaintiff's complaints are neither hypothetical nor academic.

Although Defendants argue that § 42-480 does not actually apply to Plaintiff, this limitation is

not apparent from the plain text of the statute.  Although § 42-480 is a relatively recent statute

and Defendants have not tried to enforce it against Plaintiff to date, Plaintiff has changed its

business practice to avoid violating the law and seeks clarification of its scope.  Declaratory

judgments, almost by their nature, are sought before an injury-in-fact occurs.  Nat'l Rifle Ass'n of

Am. v. Magaw, 132 F.3d 272, 279 (6th Cir. 1997).  For these reasons, Plaintiff has standing to

bring this suit.[5]

## B.  DOES § 42-480 DIRECTLY APPLY TO PLAINTIFF?

Now that Plaintiff's standing has been established, the Court turns to Plaintiff's argument

that Conn. Gen. Stat. § 42-480 is unconstitutional because it directly and indirectly purports to

regulate national banks in violation of federal law.  Plaintiff's first claim is that § 42-480 illegally

regulates the interest that it can personally charge on an RAL.

### 1. The Direct Preemption Standard

The NBA expressly permits national banks to charge interest rates at the rate allowed by

the state where the bank is located, even if this rate is higher than the rate allowed by the state

where the bank is lending.  12 U.S.C. § 85 (2005).  A national bank's right to charge interest

---

[5]Notably, Defendants make no assertion that they do not plan to enforce § 42-480 against
facilitators.  Plaintiff additionally argues that it has standing because § 42-480 has the *effect* of
regulating the interest it can charge *even when enforced only against facilitators*.  This argument,
while also having considerable merit, need not be addressed since Plaintiff's standing to
challenge this statute has already been affirmed.

rates that would be usurious if charged by a state bank has been upheld in multiple cases, and

Defendants do not contest this right here.  See, e.g., Marquette Nat'l Bank of Minneapolis v. First

Omaha Service Corp., 439 U.S. 299, 313, 99 S. Ct. 540, 58 L. Ed. 2d 534 (1978).  When state

law conflicts with federal law, courts are bound to follow federal law.  See U.S. Const. art. VI cl.

2.  Therefore, a state law which regulates the interest rate that a national bank can charge on an

RAL is preempted by federal law.

### 2. Applying the Direct Preemption Standard to This Case

**(c) No refund anticipation loan shall be made at any location other than a location in which the principal business is tax preparation.**

**(d) The interest rate for a refund anticipation loan shall not exceed (1) sixty per cent per annum for the initial twenty-one days of such loan, and (2) twenty per cent per annum for the period commencing on the twenty-second day of such loan and ending on the date of payment.**

There can be little argument that the texts of subsections (c) and (d), read in a vacuum, do

not specifically exclude national banks from this regulation.  Defendants do not contest the fact

that direct regulation of Plaintiff would be improper, but they instead offer several reasons why §

42-480 should be read beyond its text.

First, Defendants note that the entire tone of the statute is meant to exclude national

banks.  The definition of "facilitators" clearly excludes national banks in apparent recognition of

the state's inability to regulate them.  Almost every command in the statute includes the limiting

definition of the word "facilitator."  While the term "facilitators" is not used in subsections (c)

and (d), the state argues that such a limitation is clearly implied when the statute is read in its

entirety.  The Connecticut Supreme Court has stated that courts should work to give effect to the

apparent meaning of the legislature.  See Perodeau v. City of Hartford, 259 Conn. 729, 756

(2002).  With this consideration in mind, the entire statute should be construed with a view toward reconciling its parts in order to obtain a sensible and rational overall interpretation.  See Doe v. Bridgeport Police Dep't, 198 F.R.D. 325, 338-39 (D. Conn. 2001).

Second, subsections (c) and (d) were added by amendment one year after the statute was originally enacted.  See 2005 Conn. Pub. Acts 05-74 § 6.  Because these subsections were drafted at a separate time, the legislature may have neglected to exclude national banks in the manner they previously had.

Finally, Senator Louis DeLuca questioned Attorney General Richard Blumenthal about Connecticut's power to regulate national banks.  Attorney General Blumenthal issued an opinion responding to the Senator and clarifying that § 42-480 does not apply to national banks.  See Op. Conn. Att'y Gen. No. 05-029 (Oct. 24, 2005).  The Attorney General argued that by exempting national banks from the definition of "facilitators," the legislature intended to exempt national banks from § 42-480 as a whole.  Id.  Although the Attorney General's opinion is not binding on this Court, it is entitled to substantial weight when interpreting Connecticut state law.  See Cairns v. Shurgrue, 186 Conn. 300, 309, 441 A.2d 185, 190 (1982).  This provides an additional reason to believe that a Connecticut court, when interpreting this statute, would find that subsections (c) and (d) do not apply to national banks.

Taken together, these considerations suggest that the Connecticut legislature was aware of its inability to directly regulate national banks and that it did not intend to do so.  The language of subsections (c) and (d), in contrast, clearly purports to regulate national banks when read in isolation.  Construing the statute so that it only applies to facilitators would make it consistent with the opinion of the Attorney General.  As noted before, however, Plaintiff complains that

11

even if this statute were construed to apply to facilitators it would still violate Plaintiff's rights. Given this argument, the Court will address the proper construction of the statute after considering Plaintiff's position that the statute indirectly regulates national banks.

## C.  DOES § 42-480 INDIRECTLY REGULATE PLAINTIFF'S BUSINESS?

The services of a tax preparer are clearly essential to the efficient operation of RALs. Plaintiff partners with Jackson Hewitt when making RALs in order to correctly evaluate the amount that may be loaned.  As part of this partnership, Jackson Hewitt informs the customer about Plaintiff's service, provides the RAL form for the customer to fill out, and prints the check for the loan.  Jackson Hewitt clearly meets the definition of a "facilitator" under § 42-480(a)(2), and Defendants do not dispute this.  Plaintiff argues that regulating facilitators like Jackson Hewitt indirectly conflicts with the NBA.

### 1. The Indirect Preemption Standard

A Congressional statute can be in "irreconcilable conflict" with state law if (i) compliance with both state and federal law is a "physical impossibility," or (ii) the state law may "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 31, 116 S. Ct. 1103, 134 L. Ed. 2d 237 (1996); see Hines v. Davidowitz, 312 U.S. 52, 67, 61 S. Ct. 399, 85 L. Ed. 581 (1941).  A state may not obstruct, impair, or condition a national bank's right to charge the interest rates allowed under the NBA.  See 12 C.F.R. § 7.4009.  Plaintiff claims that by regulating "facilitators," which are Plaintiff's main partners in making RALs, § 42-480 effectively stands as an obstacle to allowing national banks to charge the interest rates allowed under the NBA.

The Supreme Court has held that a federal statute permitting, but not requiring, national

banks to receive savings deposits, preempts a state statute prohibiting national banks from using the word "savings" in their advertising.  See Franklin Nat. Bank of Franklin Square v. New York, 347 U.S. 373, 375-79, 74 S. Ct. 550, 98 L. Ed. 767 (1954).  It was considered a significant interference with the national bank's rights in Franklin to "permit [the] bank to engage in a business but [give the bank] no right to let the public know about it."  Id. 347 U.S. at 377-78; see also Barnett Bank, 517 U.S. at 31-38, 116 S.Ct. at 1108-12 (1996) (state statute forbidding non-local banks to sell insurance held to be in conflict with federal law permitting the sale of insurance in small towns); Fidelity Federal Savings and Loan Ass'n, v. De La Cuesta, 458 U.S. 141, 154-59, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982) (federal regulation permitting national banks to include in mortgage contracts a debt accelerating "due on sale" clause preempts a state law forbidding the use of such a clause).  States may not obstruct, impair, or condition national banks exercise of their powers.  See 12 C.F.R. § 7.4009.

These cases turn on the degree of interference, and national banks *are* subject to state laws that do not "significantly interfere" with the exercise of Congressionally-granted power. See Barnett Bank, 517 U.S. at 33; see also Anderson Nat. Bank v. Luckett, 321 U.S. 233, 247-52, 64 S. Ct. 599, 88 L. Ed. 692 (1944) (state statute administering abandoned deposit accounts did not "unlawful[ly] encroac[h] on the rights and privileges of national banks"); McClellan v. Chipman, 164 U.S. 347, 358, 17 S. Ct. 85, 41 L. Ed. 461 (1896) (applying a state statute forbidding certain real estate transfers by insolvent transferees would not "destro[y] or hampe[r]" national banks' functions); National Bank v. Commonwealth, 76 U.S. (9 Wall.) 353, 362, 19 L. Ed. 701 (1869) (national banks subject to state law that did not "interfere with, or impair [national banks'] efficiency in performing the functions by which they are designed to serve [the

Federal] Government").  When discussing how states may not obstruct, impair, or condition

national banks exercise of their powers, federal regulations also recognize that many state laws

may incidentally affect these powers without being invalid.  See 12 C.F.R. § 7.4009.

### 2. Applying the Indirect Preemption Standard to This Case

The first question that the Court must decide is whether the federal and state statutes'

purposes are in "irreconcilable conflict."  Barnett Bank, 517 U.S. at 31.  The two statutes do not

impose directly conflicting duties on national banks - as they would, for example, if the federal

law said, "you must charge 70% interest," while the state law said, "you may not."  Nonetheless,

the federal statute authorizes national banks to charge the interest rate allowed by their home

state, and the Connecticut statute makes it more difficult to do so.  Defendants candidly argue

that if Plaintiff wants to make RALs at a high-interest rate, then Plaintiff can "ope[n] branches in

Connecticut and offe[r] refund anticipation loans through its branches."  (Defendants Mem on 19

[Doc. No. 33-1].)  The time and capital needed to do this are clearly a significant burden to

Plaintiff's exercise of its Congressionally-granted authority.

Defendants also argue that a law which does *not* regulate national banks can not be

preempted under the NBA.  Defendants criticize Plaintiff for being unable to point to a case

where a state law which did not regulate national banks was preempted by the NBA.  The fact

that a statute regulates non-bank entities and not national banks is a sign that the statute will

likely not be a burden to national banks, but it does not end the inquiry.  For example, a state

statute forbidding citizens from becoming customers at a bank which lends at high interest rates

would clearly and significantly interfere with the bank's right under the NBA, even though it

does not regulate banks at all.  In 2004, Plaintiff made all 8,313 of its RALs in Connecticut

14

through tax preparers.  (Turner Aff. ¶ 5, Feb. 27, 2006, Ex. B to Pl.'s Rule 56(a)(1) [Doc. No. 27].)  Thus, Connecticut's prohibition of these partnerships - even if this prohibition is conditional - stands as an obstacle to the exercise of Plaintiff's rights under the NBA.

Since § 42-480 does "interfere" with the NBA, the next question is whether this interference is "significant."  Connecticut may lawfully limit or change the channels through with national banks offer RALs, so long as the burden imposed by this limit is not "significant."  It is difficult to determine this with respect to § 42-480 since, as already discussed, preserving the statute may require the Court to construe the text of the statute away from its exact wording.  An analysis of the likely effects of the statute is appropriate.

### a.  § 42-480 Subsection (b)

**(b) At the time a borrower applies for a refund anticipation loan, a facilitator shall disclose to such borrower on a document that is separate from the loan application [various information designed to educate the borrower about the cost and nature of the loan.]**

The Court finds that this language does not conflict with the NBA.  This subsection requires facilitators to disclose certain information about RALs when they facilitate making such a loan.  This subsection does not in any way prevent Plaintiff or other national banks from setting the interest they desire for their loans.  Plaintiff has not pointed to any section of the NBA that gives it the right to withhold the information outlined in the statute.  Subsection (b) does not request much information, so it should not be burdensome to collect and disclose.  Finally, it is facilitators and not national banks that are required to disclose this information.  Therefore, subsection (b) does not significantly interfere with Plaintiff's rights under the NBA.

North Carolina and Wisconsin have passed acts regulating the facilitation of RALs.  <u>See</u>

N.C. Gen. Stat. §§ 53-245 to 53-254 (2005); Wis. Stat. §§ 421.301 and 422.310 (2005).  These

acts are different from Conn. Gen. Stat. § 42-480 because they only imposed registration and

notice requirements.  Id.  In other words, these acts resemble subsection (b) of Conn. Gen. Stat. §

42-480, but they do not include language similar to that contained in Conn. Gen. Stat. § 42-

480(c)-(d).  Upon challenge, the Supreme Court of North Carolina upheld its RAL law, finding

that it did not violate the supremacy clause of the Constitution.[6]  See N.C. Ass'n of Electronic

Tax Filers, Inc. v. Graham, 333 N.C. 555, 429 S.E.2d 544 (1993) (The suit was brought by state

actors, but it was noted that "the record discloses no evidence that any business activities of any

national banks are impeded by the Act."), cert. denied, 510 U.S. 946 (1993).  The same reasoning

applies here to uphold subsection (b); these types of requirements simply do not regulate national

banks in violation of the NBA.

### b.  § 42-480 Subsection (c)

**(c) No refund anticipation loan shall be made at any location other than a location in which the principal business is tax preparation.**

This subsection, on its face, is not limited to facilitators.  Under this subsection, a

national bank that wanted to offer an RAL *at one of its own branches* would be prohibited from

doing so.  This is clearly a violation of NBA.

Defendants have argued that subsection (c) should be read to ban *facilitators* whose

primary business is not tax preparation from making or assisting with RALs.  Defendants point to

testimony before the legislature revealing that used car salesmen were preparing customers tax

returns and then offering RALs.  Defendants then argue that the purpose of subsection (c) was to

---

[6]The Wisconsin law has never been challenged in court.

prevent non-tax specialists from causing further damage by engaging in an already suspicious

lending practice.  Read this way, Plaintiff would be free to partner with Jackson Hewitt in order

to offer RALs since Jackson Hewitt's business is tax preparation.  However, Plaintiff would be

barred from partnering with a used car company to offer the same loans.  The Court concludes

that this construction of the statute would not conflict with the NBA.

Plaintiff has argued that the services of an experienced tax preparer are "indispensable"

for the good faith and error free preparation of an RAL.  (Pltf's Rule 56(a)(1) [Doc. No. 27] ¶ 4.)

Furthermore, tax preparers are the "favored and most efficient means" of making RALs.  (Pltf's

Mem. in Further Support [Doc. No. 40] 8.)  It is true that national banks are free to partner with

non-national bank entities in order to make loans, see 12 C.F.R. § 7.1004, but Plaintiff is not

being prevented from doing that.  Plaintiff still has thousands of potential partners across the

state.  RALs require the services of a tax preparer, and Connecticut's limitation of RAL

facilitation to places where these preparation skills are available is a valid limitation.  Therefore,

even though Plaintiff's partnership options would be limited under the construction proposed by

Defendants, the burden imposed is not significant.[7]

### c.  § 42-480 Subsection (d)

**(d) The interest rate for a refund anticipation loan shall not exceed (1) sixty per cent per annum for the initial twenty-one days of such loan, and (2) twenty per cent per annum for the period commencing on the twenty-second day of such loan and ending on the date of payment.**

This subsection also, on its face, is not limited to facilitators.  Under this subsection, a

---

[7]The Court's ability or inability to actually impose this construction is discussed in Section D of the opinion.  Here, the Court only notes that Defendants' proposed interpretation of the statute solves the federal preemption issue.

national bank that wanted to offer an RAL at one of its own branches at 70% per annum would not be able to do so.  This is in direct conflict with the NBA.

In order to avoid a direct conflict with the NBA, Defendants would have this subsection apply only to facilitators.  However, it is not clear from Defendant's position exactly how this construction would alter subsection (d).  For example, would facilitators be prevented from:

(1) *personally* offering high-interest RALs?

(2) facilitating *any* high-interest RALs? Or

(3) facilitating high-interest RALs *when the partner is not a national bank*?

Of these three constructions, the first leaves the statute virtually toothless and the second still violates the NBA.  The third construction is the most reasonable interpretation of the statute and is still consistent with Defendant's assertion that § 42-480 does not regulate national banks.

### i.  The First Interpretation - Facilitators Are Personally Prevented from Offering High-Interest RALs

This interpretation would allow Plaintiff to partner with Jackson Hewitt because Plaintiff is the entity actually lending the money to customers.  In fact, under this construction, only facilitators who themselves were primary lenders would have limits on the interest rates they could charge.  Practically, this does not appear to be what the Connecticut legislature intended. The testimony in front of the legislature speaks of tax preparers who occupy temporary storefronts, hardly the type of businesses that are able to make substantial loans.  (Testimony of Diana Leyden, Esq., to the Committee on Banking in Support of Raised Bill No. 6830, March 8, 2005 [Doc. No. 33-2].)  An interpretation which envisions facilitators as primary lenders is also at odds with the expansive definition of facilitators under § 42-480(a), which defines a facilitator

18

as anyone who "makes[,] . . . processes, receives[,] . . . accepts[,] . . . issues . . . or in any other manner acts to allow the making of a refund anticipation loan."  Conn. Gen. Stat. § 42-480(a).

### ii.  The Second Interpretation - Facilitators Are Preventing from Facilitating Any High-Interest RALs

If facilitators were prohibited from involvement in making high-interest loans, then Jackson Hewitt would be prohibited from partnering with Plaintiff unless Plaintiff lowered its interest rates.  This violates the NBA.  Again, the partnership of a company like Jackson Hewitt is essential to Plaintiff's RAL business.  Connecticut can not condition the availability of this partnership on Plaintiff's interest rates.  See 12 C.F.R. § 7.4009.  Under this interpretation, the only way that Plaintiff could make RALs at its chosen rates would be by setting up branches in Connecticut.  This is a significant burden on Plaintiff's right to set its own interest rates under the NBA, and this interpretation of the statute is therefore in conflict with the NBA.

### iii.  The Third Interpretation - Facilitators Are Prevented from Facilitating High-Interest RALs When the Partner is Not a National Bank

This interpretation of the statute specifically allows national banks to partner with facilitators while forbidding other entities from doing so.  This is consistent with the intent of the Connecticut legislature, which knew that it could not regulate the interest rates charged by national banks.  This is also consistent with the opinion of the attorney general, which argued that this statute did not regulate national banks.  This interpretation, in contrast with the first interpretation, is consistent with the broad definition of a facilitator which clearly envisions the facilitator as a "middle man" and not a principal lender.  Plaintiff would still be allowed to partner with Jackson Hewitt under this reading.  In short, this interpretation retains much of the

19

force of the statute while avoiding the conflict with the NBA.  Therefore, the Court assumes that this is the construction urged by the Defendants.[8]

## D.  CONSTRUCTIONS AND REMEDY

When there is a conflict between the law of a state and the law of the Federal Government, a court cannot resolve conflicts of authority by weighing the wisdom or need of either conflicting policy; the compact between the states creating the Federal Government resolves them as a matter of supremacy.  See Franklin Nat. Bank of Franklin Square v. New York, 347 U.S. 373, 378-379, 74 S.Ct. 550, 554, 98 L. Ed. 767 (1954).  However wise or needful Connecticut's policy, a matter as to which this Court expresses no judgment, it must give way to the contrary federal policy.

It still remains for this Court to fashion an appropriate remedy.  Plaintiff's complaint that the statute directly and improperly regulates it can be remedied by statutory construction to avoid the problem, as has been shown.  If this Court must accept the plain meaning of the text, then the law will have to be invalidated.[9]

---

[8]Again, the Court's ability or inability to actually impose this construction is discussed in the next full section of the opinion.  At this point, the only issue before the Court is whether these constructions conflict with the NBA.

[9]The Court declines to declare the entire statute invalid.  Even if subsections (c) and (d) could not be benignly construed, the Court would simply strike those two subsections from the statute.  All of the offending sections were added by amendment, which is a good indication that those sections are severable.  Cf. Henderson v. Antonacci, 62 So.2d 5, 7 (Fla. 1952).  The statute applies to a large group of actors, and it will still apply to those actors once national banks are exempted, thereby giving effect to the intent of the Connecticut legislature.  See Conn. Gen. Stat. § 1-3; see also Payne v. Fairfield Hills Hosp, 215 Conn. 675, 685, 578 A.2d 1025, 1030 (1990) (Holding that in order to overcome Connecticut's presumption of severability, it must be shown that the portion declared invalid is so mutually connected and dependent on remainder of statute as to indicate intent that they should stand or fall together and that interdependence is such that legislature would not have adopted statute without invalid portion).

If a state statute must be invalidated in a preemption case such as this, state law is displaced only "to the extent that it actually conflicts with federal law."  Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Development Comm'n, 461 U.S. 190, 204, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983); see, e.g., Exxon Corp. v. Hunt, 475 U.S. 355, 376, 106 S. Ct. 1103, 89 L. Ed. 2d 364 (1986).  "The rule is that a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it."  Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 502, 105 S. Ct. 2794, 86 L. Ed. 2d 394 (1985).  However, no invalidation is necessary if the interpretations urged by Defendants can be used to construe the statute.

It is a well accepted principle that courts should construe statutes to avoid constitutional problems if possible.  See e.g., Jones v. United States, 529 U.S. 848, 857, 120 S. Ct. 1904, 146 L. Ed. 2d 902 (2000); United States ex rel. Attorney General v. Delaware & Hudson Co., 213 U.S. 366, 408, 29 S. Ct. 527, 53 L. Ed. 836 (1909).  Of course, this can only be done when the statute at issue is "susceptible" to two different readings.  See Jones,  529 U.S. at 857.  This cannon of construction should not be used to create a new statute that is plainly contrary to the intent of the legislature.  See Edward J. DeBartolo Corp. v. Fla. Gulf Coast, 485 U.S. 568, 575, 108 S. Ct. 1392, 99 L. Ed. 2d 645 (1988).

The interpretations urged by Defendant would prevent Conn. Gen. Stat § 42-480 from conflicting with federal law and thereby violating the preemption clause of the Constitution.  Therefore, if § 42-480 is susceptible to these constructions, then the Court will adopt them as the proper reading of the statute.

The Court finds that § 42-480 is susceptible to the reading urged by Defendants.  Defendants have argued that § 42-480 should be interpreted to regulate only facilitators and to

exclude national banks.  This reading is supported by the fact that the definition of "facilitators" clearly and explicitly excludes national banks in apparent recognition of Connecticut's inability to regulate them.  Therefore, the parts of the statute can be best reconciled as a whole by assuming that Connecticut knew that it could not regulate national banks and did not intend to do so.  The state attorney general, whose opinion is given substantial weight when interpreting Connecticut law, see Cairns v. Shurgrue, 186 Conn. 300, 309, 441 A.2d 185, 190 (1982), confirms that § 42-480 is not intended to regulate national banks.  These facts show that Defendants' reading of the statute is reasonable and may better reflect the intent of the Connecticut legislature.  The Court adopts Defendants interpretations as they were detailed in this opinion as the correct interpretation of Conn. Gen. Stat. § 42-480.

**E.  SUMMARY OF THE INTERPRETATIONS**

As discussed above, subsection (b) does not conflict with the NBA and remains in full force.  Subsection (c) must be construed to apply only to facilitators.  If Plaintiff wanted to offer RALs at its own branches, it must be allowed to do so, even though Plaintiff's primary business is not tax preparation.  Other than this limitation, subsection (c) remains in full force.  Subsection (d) must be altered to allow national banks to (1) personally make RALs at the interest rate they desire, and (2) partner with facilitators in order to make RALs at the interest rates permitted by the NBA.  Therefore, *facilitators* are prevented from "facilitating" the making of an RAL above the interest rate set in subsection (d) *unless* they are doing so on behalf of a national bank.

Finally, the Court notes that it has not considered whether § 42-480 conflicts with any other federal statute besides the NBA and regulations promulgated thereunder.

22

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion **granted** as to the State of Connecticut only.  Defendants' Motion is **denied** as to the other two Defendants.  Plaintiff's Motion against these two Defendants is **granted**.  This Court shall issue a declaratory judgment as requested by Plaintiff enforcing the conclusions made herein.

SO ORDERED.

Dated at New Haven, Connecticut, August  10th , 2006.


_____
/s/
Peter C. Dorsey, U.S. District Judge
District of Connecticut